**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Jeff Rotsky, | ) | CASE NO. 1:11 CV 2111 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Merrill Lynch, Pierce, Fenner | ) | <u>Memorandum of Opinion and Order</u> |
| & Smith, Incorporated, | ) | |
| Defendant. | ) | |

**<u>Introduction</u>**

This matter is before the Court upon defendant's Motion to Dismiss the First

Amended Complaint (Doc. 12).  For the following reasons, the motion is GRANTED.

**<u>Facts</u>**

Plaintiff Jeff Rotsky filed his Complaint in the Cuyahoga County Common Pleas

Court against defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated (hereafter,

Merrill Lynch or defendant).  The matter was removed to this Court on the basis of diversity

of citizenship.  Following defendant's first motion to dismiss the Complaint, plaintiff filed his

First Amended Complaint which alleges the following.

1

Plaintiff has been licensed in the securities industry.  He has been an "associated person" registered with the Financial Industry Regulatory Authority (FINRA).  Defendant is a licensed broker-dealer in the securities industry, registered with FINRA.  Plaintiff originally pursued FINRA arbitration of his claims asserted here.  The FINRA arbitration panel, on defendant's motion, dismissed some of plaintiff's claims because they fell outside a six year time limit.  Plaintiff then withdrew his remaining claims, as permitted, and filed his Complaint in state court.

Plaintiff built his career as a registered representative in the securities industry, selling securities and other investments.  Plaintiff operated with a sales and support staff under the name "Rotsky Group."  By 1998 and early 1999, plaintiff was well-established as a financially successful representative with a material part of his income from the sales of initial public offerings and secondary offerings (referred to as Syndicate Offerings).  Plaintiff was earning about $250,000 annually from sales of Syndicate Offerings which amounted to his personal share of the approximately $500,000 his employer was receiving annually from plaintiff's sales. At that point, defendant was one of several brokerage firms making plaintiff employment offers.

In January 1999, Selden Martin, defendant's Resident Vice President, recruited plaintiff as a Merrill Lynch registered representative. At that time, defendant allocated its Syndicate Offerings to registered representatives under a proprietary allocation program identified as the Syndicate Equity Enhanced Distribution System (SEEDS).  During the ensuing employment contract negotiations between plaintiff and Martin, plaintiff informed Martin that any employment agreement would need to include a promise by defendant that

2

plaintiff's initial SEEDS ranking would be such that he would have immediate access and

participation in Merrill Lynch Syndicate Offerings at a level comparable to plaintiff's then-

current employer (i.e., plaintiff would earn approximately $250,000+, on average, per year as

his personal share of the approximately $500,000 per year Merrill Lynch would be receiving

as gross income from plaintiff's sales of the Syndicate Offerings). Plaintiff refers to this as the

Syndicate Offerings Promise to which Martin agreed.  Additionally, plaintiff informed Martin

that the agreement would also need to include a promise by defendant that plaintiff would be

provided with the specific sales and support staff he considered essential (referred to as the

Staffing Promise).

     An employment contract was then executed by plaintiff and Martin consisting of an

Agreement signed on February 1, 1999 (attached to the First Amended Complaint as Ex. A),

and an Addendum thereto signed on January 27, 1999 (attached to the First Amended

Complaint as Ex. B).

     The Court's review of Exhibit A to the First Amended Complaint shows that it is

entitled "Agreement."  It states that it is an agreement between Merrill Lynch and plaintiff

who "agree to the following terms and conditions."  It is signed by plaintiff and Selden

Martin, and dated February 1, 1999.

     The Court's review of Exhibit B reveals that this document is a letter on Merrill Lynch

letterhead dated January 27, 1999, addressed to plaintiff and signed by Selden Martin.  The

letter states as introduction,

> In addition to the economic terms highlighted in the draft contract, this letter
> summarizes the conditions for your transition from Smith Barney to Merrill Lynch,
> and serves as an addendum to the contractual terms of our employment arrangement.

3

(First Amended Compl. Ex. B) Immediately following this introductory paragraph, the letter contains eight numbered provisions.  Paragraphs 1 and 7 are at issue herein. Paragraph 1 allegedly embodies the Staffing Promise.  Paragraph 1 states:

> (1) A team configuration to include but not limited to at least: yourself, two Client Associates (Administrative Assistants); one PDP program PC (Eric); two Orientation Financial Consultants in start[1] (i.e., Nick and Priestap); one more Orientation FC as appropriately identified; and an intern selected to be groomed into a full-time position on the team as the above members progress through the PDP Program.  The term compensation structure will include in estimate of the following:

| | |
|---|---|
| Client Associates | Sherry- $27,000... |
| Orientation FC's | Nick- $32,000 after passing Series 7, John $30,000 after passing the Series 7... |
| Intern | Hourly pay ... |
| PDP FC | Eric- $36,000 |

> This term structure with its respective members and successor members, will work exclusively for the "Rotsky Group" during Jeff's employment with Merrill Lynch. These salaries will always be paid to them as long as they are at Merrill Lynch.  Each of the foregoing will work under your supervision and as long as they perform in a manner which is in accordance with you expectation.  Each will be entitled to merit raises in accordance with the same standards of other employees of Merrill Lynch employed in similar positions.  Such individuals (or their successors) will not be terminated without your consent, such consent not to be unreasonably withheld. Subject to all applicable law, and the reasonable rules and regulations of Merrill Lynch, you will have the ability to terminate any of the foregoing and to name a successor in your sole reasonable discretion, subject to the reasonable rules and regulations of Merrill Lynch relating to the qualifications of employees.

> Merrill Lynch acknowledges that maintenance of an office in or near the current location staffed (at a minimum) with the foregoing is critical and essential to your success.  Accordingly, if Merrill Lynch does not maintain such office or support group, such action may be deemed by you, at any time thereafter, to have been a termination of you without cause.

(First Amended Complaint Ex. B) Paragraph 7 allegedly embodies the Syndicate Offerings

---

[1]     The Court has done its best to reproduce the precise language of this document although some of the typed words are not entirely clear.

4

Promise.  Paragraph 7 states:

> (7) As discussed, we will initiate an appropriate seeds ranking representative of your syndicate level of business, ($500,000 approximately syndicate production), so as to create immediate access and participation in syndicate offerings upon your transfer. Also, we will provide you access to the equity desk through our "hotline" program for top equity producers.

The letter concludes:

> Jeff, I trust I have addressed your concerns and provided you with the information needed to make your transition as comfortable as possible.  I look forward to a long and mutually rewarding relationship.

(*Id.*)

The First Amended Complaint proceeds to allege that defendant thereafter breached

Paragraph 7 of the Addendum in the following manner:

> 52. Instead of initiating a SEEDS ranking for Rotsky such that he had immediate access and participation in Merrill Lynch Syndicate Offerings at a level comparable to Rotsky's then-former employer, with the result being that Rotsky would earn approximately $250,000+, on average, per year as his personal share of the approximately $500,000 per year Merrill Lynch would be receiving as gross income from Rotsky's sales of such Syndicate Offerings (the payout to Rotsky being slightly more than 50% of Merrill Lynch's gross income), Merrill Lynch initiated Rotsky's SEEDS ranking at an estimated one-tenth of the agreed-upon level.

> 54. In years the subsequent to 1999, continuing until Rotsky resigned in 2009, Rotsky suffered even greater annual losses as a direct consequence of Merrill Lynch's breach of paragraph 7 of the Addendum, because Merrill Lynch's breach regressed Rotsky in the SEEDS rankings such that the exponential benefit accorded by SEEDS—the more that was sold by a registered representative, the more Syndicate Offerings would be allocated to him—was materially less than it should have been under the Addendum.

Defendant breached Paragraph 1 of the Addendum because it agreed therein that defendant

would always pay the salaries of the "Rotsky Group" team members.  In 2000, on Martin's

recommendation, plaintiff hired two additional members (a planning based specialist and a

marketing person) whose salaries defendant was also contractually obligated to pay.  In 2001,

defendant mandated that the team members be taken off salary and become commissioned sales personnel which caused the team members to quit.

As a result of the two breaches, plaintiff suffered losses and ultimately resigned from Merrill Lynch in 2009 "because he became convinced that [defendant] would never cure its breaches."

The First Amended Complaint alleges a breach of the employment contract consisting of the Agreement and Addendum.  This matter is now before the Court upon defendant's Motion to Dismiss First Amended Complaint for failure to state a claim.

**Standard of Review**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint.  In order to survive a motion to dismiss, a complaint's factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.  *Ass'n of Cleveland Firefighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, the complaint must contain sufficient factual material to state a claim that is "plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

**Discussion**

6

Defendant argues that plaintiff's breach of contract claims fails to state a claim because they are premised on two provisions of a pre-hire letter dated January 27, 1999 which does not contain the promises that plaintiff has alleged were breached.  Nor, defendant asserts, is the letter an enforceable contract as it lacks consideration. [2]

Before turning to the merits of defendant's argument, the Court must address two ministerial issues.

First, plaintiff's breach of contract claims are premised on Paragraphs 1 and 7 of Exhibit B to the First Amended Complaint.  As discussed above, plaintiff refers to this document in the First Amended Complaint as "the Addendum."  Defendant refers to this document as "the January 27, 1999 letter."  While Exhibit B states that it "serves as an addendum to the contractual terms of our employment arrangement," it is not entitled "Addendum."[3]  It is a letter addressed to plaintiff and signed by defendant's representative. Therefore, the Court will refer to it as the January 27, 1999 letter.

Second, defendant attaches to its motion a document describing the SEEDS program, asserting that the First Amended Complaint references, and is dependent upon, defendant's Syndicate Equity Enhanced Distribution System (SEEDS) program. (Doc. 12 Ex. A) Plaintiff objects to the submission of this document.

This circuit has held that documents a defendant attaches to a motion to dismiss are

---

[2]    Additionally, defendant maintains that to the extent plaintiff claims that defendant made any misrepresentations concerning attempts to cure the alleges breaches, the claims are time-barred. Plaintiff states in his opposition that he did not intend to state a claim for negligent misrepresentation.  Therefore, the Court need not address this argument.

[3]    The Agreement, on the other hand, is entitled "Agreement."

7

"considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Gardner v. U.S.,* 2011 WL 4537751 (6th Cir. Sept. 30, 2011) (*citing Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir.2001))  *See also Weiner v. Klais and Co., Inc.,* 108 F.3d 86, 89 (6th Cir. 1997) (citations omitted) (The Sixth Circuit adopted the Seventh Circuit's approach finding that "documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.")

Plaintiff argues that the document submitted by defendant is "not the proprietary document establishing and governing SEEDS, but merely an informational flyer not mentioned" in the First Amended Complaint or central to plaintiff's claims.  (Doc. 14 at 9-10) This Court agrees with plaintiff that the document cannot be considered part of the pleadings. While plaintiff refers to the SEEDS program and it is central to his breach of contract claim, the Court has no knowledge as to whether the document submitted by defendant is an official document describing or establishing the program.[4]

The Court now turns to the merits of defendant's arguments.  Defendant argues that the January 27, 1999 letter lacks consideration and is, therefore, unenforceable. Defendant also asserts that the January 27, 1999 letter does not make the promises alleged in the First Amended Complaint.

**(1) Consideration**

---

[4]      While the Court will not consider this document as part of the pleadings, plaintiff additionally seems to assume that defendant wishes to convert the motion to dismiss to one for summary judgment.  Defendant does not ask to do so, and the Court has no basis to convert the motion.

8

Defendant argues that the January 27, 1999 letter lacks consideration and is, therefore, unenforceable.  For the following reasons, this Court agrees.

Under Ohio law, "[i]t is a basic principle of contract law that 'a contract is not binding unless supported by consideration.'" *Callihan v. Niles,* 2012 WL 34437 (Ohio App. 11th Dist. Jan. 6, 2012) (citing *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242 (2004)). Consideration is the bargained for legal benefit and/or detriment.  *Gates v. Praul*, 2011 WL 6036397 (Ohio App. 10th Dist. Dec. 6, 2011) (citations omitted) "Gratuitous promises are not enforceable as contracts, because there is no consideration." *Id.* (citation omitted). A written gratuitous promise, even if it evidences an intent by the promisor to be bound, is not a contract.  *Bretz v. Union Cent. Life Ins. Co.* 134 Ohio St. 171, 177; (1938), *Carlisle v. T & R Excavating, Inc*., 123 Ohio App.3d 277, 283 (1997).

As set forth above, the January 27, 1999 letter addressed to plaintiff and signed by defendant's agent states,

> In addition to the economic terms highlighted in the draft contract, this letter summarizes the conditions for your transition from Smith Barney to Merrill Lynch, and serves as an addendum to the contractual terms of our employment arrangement.

Eight numbered paragraphs follow.  The letter is not signed by plaintiff. Plaintiff does not promise to do, or not to do, anything.  No benefit adheres to defendant. The Agreement, on the other hand, signed by both parties, and dated February 1, 1999, states that the parties agree that plaintiff desires to terminate his former employment in favor of defendant, defendant will employ plaintiff, and plaintiff accepts employment pursuant to the terms outlined therein.

Moreover, because the January 27, 1999 letter states, "In addition to the economic

9

terms highlighted in the *draft contract...*"  (emphasis added), it did not supplement the Agreement which was executed *subsequently*.  Defendant points out that the Agreement does not contain, or refer to, the terms set forth in the January 27, 1999 letter.  Plaintiff does not dispute this assertion.

Defendant contends that the parol evidence rule would prohibit plaintiff from contradicting or augmenting the terms of the Agreement with evidence of prior or contemporaneous negotiations or promises.  "The parol evidence rule is a principle of common law providing that 'a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing.' " *Bull Run Properties, LLC v. Albkos Properties, LLC,* 2011 WL 5334805 (Ohio App. 11th Dist. Nov. 7, 2011) (citing *Bellman v. Am. Internatl. Group*, 113 Ohio St.3d 323 (2007)[5].

Plaintiff maintains that he has alleged that the two documents are one contract, and extrinsic evidence may be considered to show that the Agreement was only partially integrated.  For the following reasons, this Court disagrees.

Plaintiff seems to assert that the Court must accept as true the allegation contained in

---

[5]     *See also Harvey v. KP Properties, Inc.,* 2012 WL 252492 (Ohio App.8th Dist. Jan. 22, 2012) (internal quotations omitted) (citing *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 440, 662 N.E.2d 1074 (1996), quoting 3 Corbin, Corbin on Contracts, Section 573, 357 (1960)). ("The parol evidence rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements. When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.")

the First Amended Complaint that the written employment contract consists of the February 1, 1999 Agreement and the Addendum "thereto" (the January 27, 1999 letter). Plaintiff states that defendant's lack of consideration argument "can proceed only if Merrill Lynch successfully severs its Addendum promises from the Agreement- sundering the Employment Contract directly contrary to the allegations in the [First Amended Complaint]..."  (Doc. 14 at 11) But, under Ohio law, "[c]ourts generally determine the existence of a contract as a matter of law."  *Nexus Communications, Inc. v. Qwest Communications Corp.,* 193 Ohio App.3d 599 (10th Dist. 2011) (citations omitted).  The Court need not accept as true the legal conclusion as to what constituted the employment contract.

Plaintiff also notes that the Agreement "indubitably recites ample consideration." (*Id.* at fn. 4)  In so stating the latter, plaintiff appears to concede that the January 27, 1999 letter, standing alone, lacks consideration.

Plaintiff points out that the parol evidence rule does not apply to partially integrated contracts, and presumably contends that the Agreement is partially complete with the Addendum being a part of it.

"While the parol evidence rule applies to completely or fully integrated contracts, it does not apply to partially integrated contracts.  A contract is partially integrated if the parties adopt it as a final expression of only one portion of a larger agreement, making the contract incomplete. A party may introduce extrinsic evidence to supplement, but not vary or contradict, the written terms of a partially integrated contract."  *McGonagle v. Somerset Gas Transm. Co., LLC,* 2011 WL 5353089 (Ohio App. 10th Dist. Nov. 8, 2011) (citing *Williams v. Spitzer Autoworld Canton, L.L.C.*, 122 Ohio St.3d 546 (2009) ) ) *See also Motorists Mutual*

*Ins. Co. v. Vornado,* 2011 WL 66502 (N.D.Ohio Jan.10, 2011) (citations omitted) ("When a contract is partially integrated, it represents an agreement between the parties as to only a portion of a larger agreement.") The "introduction of extrinsic evidence does not violate the parol evidence rule because that rule applies only after an integrated or partially integrated agreement has been found." *26901 Cannon Road LLC v. PSC Metals, Inc.*, 2001 WL 31479007 (Ohio App. 8th Dist. Nov. 7, 2002) (citations omitted).

Plaintiff argues that whether a writing was or was not adopted as a completely integrated agreement may be proved by any relevant evidence.  Plaintiff cites to *Sroka Advance Vehicles, Inc. v. Material Handling, Inc.,* 2011 WL 3047720 (N.D.Ohio July 25, 2011) (citations omitted), which states, "In determining whether an agreement is partially- or fully-integrated, a court may consider admissible extrinsic evidence." On this basis, plaintiff asserts:

> [U]nder the foregoing legal authorities, [plaintiff] is entitled to prove what he has alleged in the [First Amended Complaint]- that the Employment Contract consists of the Agreement and the Addendum. And to do so, he is entitled to bring to bear evidence of the tenor described in the  [First Amended Complaint]—the parties' negotiations regarding the Syndicate Offerings Promise and the Staffing Promise, the simultaneous negotiation of the Agreement and the Addendum, the parties' mutual statements of intent that the Agreement and the Addendum together be the Employment Contract, the reference in the Addendum to the "draft contract" which was a near-final version of
> the Agreement, the multiple Merrill Lynch representations that its Addendum breaches would be cured, and Merrill Lynch's partial cure of the paragraph 1 breaches.

(Doc. 14 at 14).

But, defendant contends that in order to have the benefit of the extrinsic evidence, plaintiff must first show that the Agreement is incomplete or ambiguous- which he has not done. This Court agrees.

12

Under Ohio law, the "question of whether a contract is partially integrated must be determined from the four corners of the document itself." *Motorists Mutual Ins. Co. v. Vornado,* 2011 WL 66502 (N.D.Ohio Jan.10, 2011) (citing *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St.3d 271 (1994); *Miller v. Lindsay-Green, Inc.,* 2005 WL 3220215 (Ohio App. 10th Dist. Dec. 1, 2005) (citations omitted).  "In other words, extrinsic evidence is admissible to show the omitted portions of a contract if it is incomplete on its face, as where it is a mere memorandum omitting essential elements." *Id.* (citing *Thomas J. Emery Mem. v. Kain* (App.1935), 19 Ohio Law Abs. 351, 352 ("Where it is apparent from the writing itself that it does not embody the entire contract of the parties, but only some distinct and separable part[,] the case is not within the [parol evidence] rule.")

Plaintiff relies on *Sroka Advance Vehicles, supra,* in arguing that other evidence is admissible to determine whether the Agreement was partially integrated.  But, that case cited to *Monroe Excavating, Inc., v. DJD & C Dev.,* 2011 WL 2552720 (June 17, 2011) (citations and internal quotations omitted), which clearly states,

> In order to determine whether the parol evidence rule should apply, one must first determine whether a purported contract is in fact a final and complete agreement between the parties. The parol evidence rule has no application until the initial issue of whether the parties intended the proffered document to be an expression of their agreement has been resolved. A trial court may consider any admissible evidence to determine whether a writing is a complete and integrated contract between the parties. In order to presume that a writing is a final and integrated contract, it must be facially complete and unambiguous.

Thus, if the Agreement is facially complete and unambiguous, the Court presumes such and does not resort to extrinsic evidence.  Plaintiff does not demonstrate that the Agreement is incomplete on its face so as to allow this Court to incorporate the January 27,

13

1999 letter.  Plaintiff does not point to missing terms or ambiguity in the Agreement.  Rather, the Court agrees with defendant that there is nothing within the four corners of the Agreement to suggest that it is only partially integrated.[6]  In the Agreement, defendant agrees to employ plaintiff and plaintiff accepts employment pursuant to the terms listed in the Agreement which addresses compensation, reduced to dollar amounts, and sets forth specific dates and certain contingencies.  There is no indication that the terms are unclear or ambiguous.

Moreover, even if the Agreement was partially integrated and not subject to the parol evidence rule, the letter provides for terms not addressed in the Agreement.  The latter does not reference the January 27, 1999 letter.  The letter refers to a "draft contract" and sets forth terms  not addressed in the Agreement.  As such, the letter would not provide an explanation for terms discussed in the Agreement, or provide missing terms. "Although the parol evidence rule does not apply to partially integrated contracts, when such a contract is at issue, a court may not admit extrinsic evidence that contradicts or varies the terms of the contract. Rather, admissible extrinsic evidence is limited to additional contractual terms that are consistent with the written terms of the partially integrated contract." *Miller v. Lindsay-Green, Inc.,* 2005 WL 3220215 (Ohio App. 10th Dist. Dec. 1, 2005) (citations omitted).  The letter would vary the terms of the Agreement because the Agreement did not address the issues set forth in the letter.

For these reasons, the January 27, 1999 letter lacks consideration and there can be no

---

[6]     The Agreement does not contain an "integration clause," but the parties agree that under Ohio law even the presence of such a clause is not determinative.

breach of contract claims based upon it.[7]

### (2) Alleged Promises

Even assuming the January 27, 1999 letter is an enforceable contract, defendant argues that the breach of contract claims fail because the letter does not contain the promises alleged.

It is defendant's assertion that the First Amended Complaint alleges that Merrill Lynch was contractually obligated to provide plaintiff with a level of syndicate business that would result in at least $250,000 in compensation to him, but a review of Paragraph 7 of the January 1999 letter shows no such promise.

As set forth above, Paragraph 7 states in relevant part: "... we will initiate an appropriate seeds ranking representative of your syndicate level of business, ($500,000 approximately syndicate production), so as to create immediate access and participation in syndicate offerings upon your transfer."

Defendant contends that Paragraph 7, states nothing about the compensation that

---

[7]     Defendant also notes that the January 27, 1999 letter is an "addendum." Defendant asserts in its reply brief that even assuming the letter "supplemented" the subsequently executed February 1, 1999 Agreement, the letter required separate consideration. This Court agrees. The letter states that it is an "addendum." Under Ohio law, where the parties to a contract have altered their current agreement or created an addendum to it, consideration would be required. *Discover Bank v. Schiefer,* 2010 WL 2602005 (Ohio App.10th Dist. June 29, 2010) (citations omitted); *Lee Supply Corp. v. Triangle Capital Corporation*, 1997 Ohio App. LEXIS 812 (2d App. Dist. Feb. 14, 1997) ("The requirement of consideration applies to new contracts, as well as to any agreement to modify an existing contract. Thus, regardless of whether [the] alleged promise contained in the correspondence is viewed as a modification of the Settlement Agreement or as a new, independent contract, that promise is not enforceable... unless supported by valid consideration...")

would result to plaintiff from his SEEDS ranking although plaintiff's claim is premised on an alleged promise of $250,000 in compensation from syndicate business.[8]

Defendant further asserts that the January 27, 1999 letter states nothing about Merrill Lynch providing plaintiff with at least $500,000 in syndicate business.  Instead, Paragraph 7 only discusses providing plaintiff with an initial SEEDS ranking representative of him doing $500,000 in syndicate business.  Defendant maintains that it "was simply placing [plaintiff] in a position that would (presumably) put him ahead of most colleagues in terms of the ability to receive syndicate business; the letter contains no guarantee about how much syndicate business would in fact result from that ranking. Merrill Lynch cannot force companies to go public and Merrill Lynch cannot force its customers to buy initial public offerings."  (Doc. 12 at 10)

Finally, defendant asserts that the letter states nothing about a SEEDS ranking that would extend throughout the entirety of Rotsky's employment, thereby creating annual losses. Rather, defendant contends that the letter clearly and unambiguously provides that the ranking was a one-time event, as evidenced by the terms "initiate," "immediate," and "upon your transfer," and defendant's obligations ceased at that time.

Plaintiff responds that defendant has re-characterized the First Amended Complaint so that it alleges that defendant breached its promise to plaintiff of $250,000 in compensation from syndicate business. Plaintiff states that this is not what was alleged. Plaintiff asserts that

---

[8]     Defendant points out that the original Complaint categorized the breach as an agreement to pay annual wages while the First Amended Complaint characterizes it as a failure to initiate a SEEDS ranking that resulted in annual losses.  Plaintiff correctly states that an amended complaint supercedes the original complaint. Thus, the Court will not compare the allegations.

16

defendant has confused the damages resulting from the breach with the promise breached.
Rather, plaintiff contends that the allegation is that defendant "promised a ***ranking*** that
afforded [plaintiff] a Syndicate Offering business ***opportunity*** to earn $250.000 dependent
upon the diligence, knowledge, and skill he would bring to bear.  He was not promised a
Syndicate Offering-based salary, and he has not so alleged."  (Doc. 14 at 14-15, emphasis in
original) Pointing to Paragraph 7 of the letter, plaintiff asserts that the following italicized
terms make up the promise defendant broke, i.e., the failure to initiate the appropriate SEEDS
ranking promised to plaintiff:

> As discussed, *we will initiate an appropriate seeds ranking representative of your*
> *syndicate level of business, ($500,000 approximately syndicate production)*, so as to
> create immediate access and participation in syndicate offerings upon your transfer.
> Also, we will provide you access to the equity desk through our "hotline" program for
> top equity producers.

Plaintiff insists that this is "precisely" what is alleged in paragraph 52 of the First Amended

Complaint:

> 52. Instead of initiating a SEEDS ranking for Rotsky such that he had immediate
> access and participation in Merrill Lynch Syndicate Offerings at a level comparable to
> Rotsky's then-former employer, with the result being that Rotsky would earn
> approximately $250,000+, on average, per year as his personal share of the
> approximately $500,000 per year Merrill Lynch would be receiving as gross income
> from Rotsky's sales of such Syndicate Offerings (the payout to Rotsky being slightly
> more than 50% of Merrill Lynch's gross income), Merrill Lynch initiated Rotsky's
> SEEDS ranking at an estimated one-tenth of the agreed-upon level.

Plaintiff maintains that because he was denied the promised opportunity upon which he would

have capitalized, the monetary loss resulted.

Plaintiff then proceeds to explain that the promised ranking- "$500,000 approximately

syndicate production" - has special meaning.  Plaintiff asserts in his brief that "[i]n this

17

context the word 'production' was intended to mean, and does mean, 'gross income to Merrill Lynch' such that Rotsky would earn approximately $250,000+, on average, per year as his personal share of that gross income amount (the payout to Rotsky being slightly more than 50% of Merrill Lynch's gross income." (Doc. 14 at 15) Plaintiff points to paragraph 45 of the First Amended Complaint wherein the same is alleged:

> 45. As Rotsky and Agent Martin agreed, the term "production" in paragraph 7 was intended by them to mean, and does mean, "gross income to Merrill Lynch" such that Rotsky would earn approximately $250,000+, on average, per year as his personal share of that gross income amount (the payout to Rotsky being slightly more than 50% of Merrill Lynch's gross income). This meaning of "production" is the same meaning in general use at Merrill Lynch at the time.

Plaintiff asserts that the Court may consider extrinsic evidence given the "special meaning" of the promised ranking.[9]  Additionally, plaintiff contends that extrinsic evidence is permissible where, as here, the language of the contract is unclear and ambiguous given that the meaning of "production" is not evident from the Addendum itself, and plaintiff's interpretation of "production" is a reasonable one.  Plaintiff maintains that the meaning of "production" is a question of fact, not resolvable on a motion to dismiss.

Plaintiff reasons that as a result of being ranked about one-tenth of the level where he should have been ranked, plaintiff earned only $25,000 from Syndicate Offerings in 1999 and, therefore, suffered a loss that year in the amount exceeding $200,000 (as alleged in paragraph

---

[9]     For this proposition of law, plaintiff cites, among other cases, this Court's decision of *Santana v. Union Fidelity Life Ins. Co.,* 2009 WL 4799376 (N.D.Ohio July 1, 2009) (citations omitted), wherein the Court merely recognized, "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered to give effect to the parties' intentions."

53 of the First Amended Complaint).  The losses then continued in the subsequent years due to lost ranking.

For the following reasons, the Court agrees with defendant that plaintiff's assertions as to Paragraph 7 are unavailing.

Paragraph 7 of the January 27, 1999 letter only states:

(7) As discussed, we will initiate an appropriate seeds ranking representative of your syndicate level of business, ($500,000 approximately syndicate production), so as to create immediate access and participation in syndicate offerings upon your transfer. Also, we will provide you access to the equity desk through our "hotline" program for top equity producers.

As acknowledged by plaintiff in his brief, this paragraph guaranteed him a SEEDS ranking only.  Plaintiff goes on to attempt to persuade the Court that the clause, "500,000 approximately syndicate production," had a "special meaning" given to it by the parties so that plaintiff would be guaranteed $250,000 compensation per year ("the word production was intended to mean... gross income to Merrill Lynch such that [plaintiff] would earn approximately $250,000+, on average, per year...") But, this interpretation relies on extrinsic evidence which the Court cannot consider because the January 27, 1999 letter clearly refers to a SEEDS ranking only, and is not ambiguous.  "Terms in a contract are ambiguous if their meanings cannot be determined from reading the entire contract, or if they are reasonably susceptible to multiple interpretations."  *Consolo v. Menter*, 2011 WL 6076340 (Ohio App. 9th Dist. Dec. 7, 2011) (citations omitted)

Plaintiff's allegation that "production" meant "compensation" is not consistent with the terms of the paragraph which only addresses the SEEDS ranking.  Furthermore, as defendant points out, Merrill Lynch drafted the letter and its agent signed it and, therefore, it would not make

19

sense to infer that *plaintiff* used a special meaning with respect to the clause.

Plaintiff's argument that he only alleged a breach of a promised ranking which resulted in an opportunity to earn $250,000, is a wrangling with the words.  Rather, the Court agrees with defendant that the First Amended Complaint is alleging that defendant was contractually obligated to provide plaintiff with a level of syndicate business that would result in at least $250,000 in compensation, which the January 27, 1999 letter does not promise given that it does not mention "compensation," and does not state that defendant would provide plaintiff with $500,000 in syndicate business- but only a ranking of such.

Finally, defendant also points out that the February 1 Agreement between the parties does use the term compensation and outlines a detailed description of what plaintiff's compensation would entail (i.e., monthly transition compensation payments, three months salary, asset-based bonuses, and a contingent award).  This undermines plaintiff's theory that the parties had a "special meaning" for production that meant compensation in the letter.

Despite plaintiff's characterization of his allegations, the First Amended Complaint alleges that a SEEDS ranking equated to $250,000 per year in compensation.  Because the January 27 letter does not make this promise, the breach of contract claim based on the Syndicate Offerings Promise fails to state a claim.

The Court also agrees that Paragraph 1 similarly does not support plaintiff's breach of contract claim.

 The First Amended Complaint alleges, in part:

69. Paragraph 1 of the Addendum set forth that Merrill Lynch would always pay the salaries of the Rotsky Group team members, including but not limited to, the team members identified in the initial, minimum Rotsky Group team configuration specified in paragraph 1.

20

70. In or about 2000, Agent Martin stated that Rotsky should expand the minimum team configuration to add a planning base specialist and a marketing person.

71. In response, Rotsky did hire a planning base specialist and a marketing person, and Merrill Lynch was contractually obligated to pay their salaries too, because they were Rotsky Group team members.

72. In or about 2001, Merrill Lynch mandated that Rotsky Group team members be taken off salary and that all become commissioned sales personnel ("Mandate"), thereby breaching Merrill Lynch's promise (contained in paragraph 1 of the Addendum) that Merrill Lynch would always pay Rotsky Group team members' salaries.

73. Rotsky never consented to the Mandate.

74. Over time, Rotsky Group support personnel thereafter quit, as they did not want to work as commissioned sales personnel.

75. Thus, by its Mandate, Merrill Lynch effectively terminated these Rotsky Group team members in breach of Merrill Lynch's promise (contained in paragraph 1 of the Addendum) not to terminate Rotsky Group team members without Rotsky's consent.

76. This forced exodus of Rotsky Group team members left Rotsky without adequate support staff...

77. Merrill Lynch also did not immediately replace the terminated Rotsky Group team members who were driven to quit by the Mandate...

Defendant contends that because the January 27, 1999 letter makes no mention of a planning base specialist or a marketing person, or afford plaintiff any rights with respect to resignations of his team, there is no breach of contract for failure to provide a planning base specialist or a marketing person, or for relief in the event support staff quits.

Plaintiff asserts that defendant has again tried to re-characterize his allegations because the First Amended Complaint does not allege that defendant "failed to provide" the planning base specialist or a marketing person, nor does it mention "resignations."  Rather, it alleges that those two positions were provided and that defendant "effectively terminated" the

21

team who were "driven to quit by the Mandate" in a "forced exodus" in breach of defendant's promise that team members would not be terminated without plaintiff's consent.  Because the Mandate applied to all team members, it was not limited to the planning base specialist or a marketing person.

To the extent plaintiff alleges breach of contract related to the hiring of a planning base specialist or a marketing person, the January 27, 1999 letter does not mention them, and the alleged statement by Martin that plaintiff should add these two positions post-dated the letter. In addition, as to plaintiff's allegation that the Mandate affected his entire support staff, the First Amended Complaint alleges that the team members "quit." (¶ 74) The letter states that "[s]uch individuals (or their successors) will not be terminated without your consent..."

While plaintiff contends that he alleges that the staff was "effectively terminated" and were "driven to quit," he also alleges that they "thereafter quit as they did not want to work as commissioned sales personnel."  (¶ 74) If the staff quit because they did not like the new "Mandate," then they were not terminated.  The letter only addresses termination.  And, therefore, the breach of contract claim based on Paragraph 1 fails.

**Conclusion**

For the foregoing reasons, defendant's Motion to Dismiss the First Amended Complaint is granted.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 2/29/12